IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DANTE WARD, | ) | |
| | ) | Case No. CV-04-006-S-BLW |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM DECISION** |
| v. | ) | **AND ORDER** |
| | ) | |
| SORRENTO LACTALIS, INC., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it (1) plaintiff's motion for attorney fees, and (2) Sorrento's renewed motion for judgment as a matter of law and alternative motion for new trial or to alter or amend the judgment. The Court held oral argument on December 13, 2005, and the motions are now at issue.

For the reasons expressed below, the Court will award $116,148.65 in fees to plaintiff, and will grant in part and deny in part Sorrento's motion. More specifically, with regard to Sorrento's motion, the Court will (1) deny the motion on liability; (2) grant the motion in part as to the front pay award, reducing it to $175,000 and giving plaintiff the option of either accepting that sum or proceeding to a new trial limited to the front pay issue; and (3) grant the motion in part as to

**Memorandum Decision and Order – Page 1**

the emotional distress damages reducing them to $300,000.  The award of damages is therefore reduced from $1.25 million to $475,000.

## ANALYSIS

### 1.   <u>Liability</u>

As the Court stated from the bench during oral argument, the Court will not revisit Judge Nelson's decision, and finds sufficient evidence to support the jury verdict that Sorrento violated the ADA in firing Ward.

### 2.   <u>Front Pay</u>

The jury awarded $805,000 in front pay.  It is apparent that they arrived at that figure by accepting the testimony of Cornelius Hofman, an economist, that Ward would make about $17,000 a year as a laborer for the next 23 years that he had left in his work-life.[1]  In comparison, Ward had been making about $52,000 a year at Sorrento when he was fired.  The difference between this wage, and his expected future wage as a laborer, was $35,000.  If that figure is multiplied by Ward's 23-year work-life, the total is $805,000, the sum awarded by the jury.  By calculating damages in this manner, the jury assumed that Ward would never again rise above menial labor, and awarded him front pay for the rest of his working life.

---

[1]   Ward had 28 years to go before reaching the standard retirement age, according to Hofman.  During those 28 years, Hofman estimated, Ward would be off work for various reasons for a total of 5 years.  Thus, Hofman concluded that Ward would be actually working (and earning a wage) for 23 years of the 28 years remaining to retirement age.

**Memorandum Decision and Order – Page 2**

Front pay is an award of future lost earnings to make a victim of an improper employment action whole.  *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1346 (9th Cir. 1987).  The front pay award must be reduced by the amount plaintiff could earn using reasonable mitigation efforts.  *Id.*  Thus, front pay is designed "to be temporary in nature."  *Gotthardt v. National Railroad Passenger Corporation*, 191 F.3d 1148, 1157 (9th Cir. 1999).  An award of front pay "does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing."  *Id.*  Because of the "potential for windfall," the use of front pay as a remedy "must be tempered."  *Id.*  The plaintiff bears the burden of providing the Court "with the essential data necessary to calculate a reasonably certain front pay award."  *Peyton v. DiMario*, 287 F.3d 1121, 1129 (D.C. Cir. 2002).

If the plaintiff shows that he may never find comparable employment, "an award [of front pay] lasting until retirement may be appropriate."  *See* Larson, *Employment Discrimination*, § 92.12 at pp. 92-118 to -119 (2nd ed. 2005).  In *Gotthardt*, the Circuit approved a front pay award lasting until retirement – a period of 11 years – when the plaintiff was 59 years old and had been incapacitated by the employer's wrongful conduct.  *Gotthardt*, 191 F.3d at 1156.  Another court, distinguishing its case from *Gotthardt*, reversed an award of front pay lasting until retirement – a period of 26 years – when the plaintiff was only 34

**Memorandum Decision and Order – Page 3**

years old, and failed to present proof that she would be unable to find comparable work during the next 26 years of her work-life.  *Peyton*, 287 F.3d at 1129. According to *Peyton*, "other courts seem to agree that plaintiffs in their forties are too young for lifetime front pay awards."  *Id*. (citations omitted).

Ward was 34 years-old when the jury awarded him a "lifetime" front pay award.  That award presumes that for the remainder of his work-life, Ward would never be able to earn more than a laborer's wage.

That presumption is immediately suspect under *Gotthardt, Cassino,* and *Peyton*.  Ward is a young man with a history of being promoted to management positions.  Why is that path now forever closed?

Certainly it is not for lack of qualification.  Ward's own expert in vocational rehabilitation, Mary Barros-Bailey, testified that although it would take a "prolonged job search" for Ward to find a management position, *see Trial Transcript of Barros-Bailey Testimony* at p. 22, he "did have some transferrable skills . . . [in] management jobs."  *Id*. at p. 20.

Rather than suggesting that Ward would always be a laborer, Barros-Bailey testified that he could obtain a warehouse management job by beginning in an entry-level warehouse position and working his way up.  *Id*. at pp. 20-21.  There were 39 of these entry-level positions in the local area during the month of May,

**Memorandum Decision and Order – Page 4**

2004.  *Id*. at p. 21.  Of those 39 positions, she testified that "most of them required lifting of 50 pounds or greater."  *Id*. at p. 22.

Ward seizes on this last sentence of her testimony to argue that all entry-level warehouse positions were now closed to him, because his orthopedic surgeon, Dr. Douglas Smith, had prohibited him from lifting more than 50 pounds, a restriction that was permanent.  Because these entry-level positions were completely closed, Ward argues, he could never obtain the entry-level position that would be his passport to management.

That argument reads far too much into Barros-Bailey's testimony.  She never testified that Ward was forever precluded from an entry-level warehouse job by lifting restrictions.  She never even implied such.

She merely testified that of the 39 entry-level warehouse positions available during a single month of a single year, "most" of them had a lifting requirement.  This implies that some of those positions did not have a 50-pound lifting restriction.  Barros-Bailey never testified that Ward would be unfit for those jobs.  And if there were entry-level positions open to Ward during that single month, more would open in the coming months and years.

There is no other testimony supplying what Barros-Bailey failed to supply – that is, evidence that Ward was forever precluded from obtaining entry-level

**Memorandum Decision and Order – Page 5**

warehouse jobs.  Dr. Nilsson, a neuropsychologist who treated Ward for pain, did

testify that Ward's "pain appeared to be a significant limiting factor in – in being

able to be gainfully employed."  *See Trial Testimony of Dr. Nilsson* at p. 19.  But

Ward's pain was controlled by medication and Ward himself testified that the

medication did not limit his job performance.  Dr. Nilsson is a neuropsychologist,

not a vocational expert, and so he never testified on whether Ward was fit for

entry-level warehouse positions.

On cross-examination, defense counsel, apparently reading from Dr.

Nilsson's expert report,[2] asked him whether one of the conclusions he reached was

that "given the combination of symptoms that you saw in February of 2004, you

had a hard time imagining him being consistently and gainfully employed?"  *Id*. at

p. 27.  Dr. Nilsson answered in the affirmative.  *Id*.  But this vague testimony, by

someone who is not a vocational expert, cannot be interpreted to mean that Ward

could never find an entry-level warehouse job.

The Court must view all this evidence in the light most favorable to Ward.

*See Fenner v. Dependable Trucking Co.,* 716 F.2d 598, 603 (9th Cir. 1983).  The

jury's verdict must be upheld if supported by substantial evidence.  *Pavao v.*

---

[2]  Dr. Nilsson had not testified to this conclusion on direct; thus, counsel must have been referring to the conclusion he reached in his expert report.

**Memorandum Decision and Order – Page 6**

*Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  Substantial evidence is relevant

evidence reasonable minds might accept as adequate to support the jury's

conclusion, even if it is also possible to draw a contrary conclusion.  *Watec Co.,*

*Ltd. v. Liu,* 403 F.3d 645, 651 n. 5 (9th Cir. 2005).  The Court cannot weigh the

evidence or assess the credibility of witnesses in determining whether substantial

evidence exists.  *Id*.  Ultimately, the Court must determine if the damage award is

"grossly excessive or monstrous, clearly not supported by the evidence, or only

based on speculation and guesswork."  *Los Angeles Mem'l Coliseum Comm'n v.*

*Nt'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986).

        The evidence, viewed under these standards, shows that Ward was a young

man with extensive warehouse management experience who was going to have a

"prolonged" job search to find a comparable management position.  He may have

to begin in an entry-level position and work his way up, as he had done on two

prior occasions.  Those entry-level positions were numerous in the local area.

While he was unfit for many of them because of lifting restrictions, that still left

other positions open to him.

        There is absolutely no evidence supporting a conclusion that Ward would be

forever precluded from obtaining an entry-level warehouse position and working

his way back up to management.  Ward's experts – Barros-Bailey and Drs. Nilsson

and Smith – never testified that Ward was unfit for all entry-level warehouse positions available in the local area.  The only conclusion reasonable minds could reach would be that Ward would obtain an entry-level position and then work his way back to a management position after a "prolonged" period, as Barros-Bailey testified.

Based on the standards set forth above, the jury verdict on front pay must be set aside.  It is grossly excessive and clearly unsupported by the evidence.

The Court has the discretion to grant a remittitur, reducing the damages to the maximum authorized under the evidence, and then offering the plaintiff the choice of accepting the remittitur or proceeding to a new trial on the issue of the damages set aside.  *Morgan v. Woessner*, 997 F.2d 1244 (9th Cir. 1993).  The Court finds that the maximum period of time authorized under the record for front pay would be five years.  Within that time, Ward would be able, using reasonable diligence, to work his way up from an entry-level warehouse position to a management position comparable to that he held at Sorrento.  This would recognize the "temporary" nature of the front pay award, while at the same time satisfying the goal of making Ward whole for being fired in violation of the ADA.

The maximum front pay award would therefore be $175,000 (five years of front pay multiplied by $35,000, the salary differential between a laborer and a

**Memorandum Decision and Order – Page 8**

manager).  The Court will give Ward the choice of either accepting $175,000 as front pay or proceeding to a new trial limited solely to the issue of the amount of front pay to which he is entitled.

Ward shall have twenty (20) days from the date of this decision to either accept or reject the remittitur.  In the meantime, the Court will withdraw the Judgment (Docket No. 89) entered for $1.25 million.  If Ward accepts the remittitur, the Court will issue an Amended Judgment awarding damages in the sum of $475,000.  If Ward rejects the remittitur, the Court will proceed to trial on the front pay issue only, and, if an award is made following trial, shall enter an Amended Judgment at that time.

## 3.    **Emotional Distress**

The jury awarded $445,000 for emotional distress.  It is undisputed that this sum must be reduced to $300,000 to comply with the ADA's statutory cap set forth in 42 U.S.C. § 1981a(b)(3).  Sorrento argues further that the entire award should be vacated because it is without support in the evidence.

In this Circuit, a jury verdict for emotional distress damages will not be set aside unless it is "grossly excessive or monstrous."  *Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020, 1040 (9th Cir. 2003).  The *Zhang* case expressly rejected the standard used in other circuits requiring evidence that the emotional

distress be "demonstrable, genuine, and adequately explained."  *Id*.  In this Circuit, emotional distress damages are subjective in nature and can be based entirely on an appropriate inference from circumstances.  *Id*. (citing *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994)).

At trial, Ward testified that "[a]fter the termination [from Sorrento], we found that we could no longer afford [our home]."  *See Trial Transcript of Ward's Testimony* at p. 35.  He went on to testify that he lost the home through foreclosure. *Id*. at p. 36.  He also testified that his car was repossessed after he was terminated from Sorrento.  *Id.*

Ward never testified that he suffered emotional distress as a result of these events.  However, Dr. Nilsson, a neuropsychologist who treated Ward, testified that the loss of the home "was a huge issue for [Ward]."  *See Trial Transcript of Dr. Nilsson's Testimony* at p. 29.  Dr. Nilsson explained that at Sorrento, Ward had been "very successful financially and helping his family, his wife was not working, and then . . . all that changed" with the termination.  *Id*. at p. 30.

The issue before the Court is whether, in light of this evidence, an award of $300,000 is "grossly excessive or monstrous."  In *Zhang*, the Circuit affirmed an award of $223,155 for emotional distress when the plaintiff's termination caused

**Memorandum Decision and Order – Page 10**

him "great hurt and humiliation." *Zhang*, 339 F.3d at 1041.[3]

This case is close to *Zhang*. The jury could reasonably conclude that Sorrento's termination of Ward led to the foreclosure of his home and the repossession of his car, two humiliating and hurtful events that were a "huge issue" for Ward. In light of there circumstances the Court cannot find that the sum of $300,000 is grossly excessive or monstrous.

## 4.    Attorney Fees & Costs

The Court finds that Ward is the prevailing party and entitled to fees and costs under 42 U.S.C. § 12205. The lodestar figure sought by Ward is $116,148.65. The Court finds that the hourly rates, the hours charged, and the total sum are all reasonable and appropriate.

Ward seeks in the alternative a sum of $416,625 based on a reasonable contingency fee of one-third of the Judgment. Given the Court's reduction of the verdict set forth above, the revised calculation would yield a fee of $156,750, a sum closer to the lodestar figure. Nevertheless, the contingency fee award is improper in this Circuit. *See Hamner v. Rios*, 769 F.2d 1404, 1409 (9th Cir. 1985). The Court will therefore award the lodestar figure of $116,148.65. The Clerk has

---

[3] In *Zhang,* the Circuit noted some confusion over whether the jury awarded $223,155 or $123,155 for emotional distress. The Circuit decided that it did not need to resolve the confusion because it would affirm the award even at the higher sum. *Id*. at 1040.

**Memorandum Decision and Order – Page 11**

awarded costs to Ward in the sum of $4,456.54.  The Court affirms that award.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the renewed motion for judgment as a matter of law and alternative motion for new trial or to alter or amend the judgment (Docket No. 90) is GRANTED IN PART AND DENIED IN PART.  It is granted to the following extent: (1) As to front pay, it is granted to the extent it seeks to reduce the award for front pay to $175,000 and give plaintiff the option of either accepting that sum or proceeding to a new trial limited to the front pay issue; and (2) As to damages for emotional distress, it is granted to the extent it seeks to reduce the award to $300,000.  It is denied in all other respects.

IT IS FURTHER ORDERED, that plaintiff shall notify the Court in writing within twenty (20) days from the date of this decision whether plaintiff will accept the remittitur, or reject the remittitur and proceed to a new trial solely on the issue of front pay.

IT IS FURTHER ORDERED, that the motion for fees (Docket No. 91) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks $116,148.65 in attorney fees.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the Judgment (Docket No. 89) is

**Memorandum Decision and Order – Page 12**

DEEMED WITHDRAWN and without effect.  If the plaintiff accepts the

remittitur, the Court will issue an Amended Judgment in the sum of $475,000

representing damages, and $116,148.65 representing the fee award.  If the plaintiff

rejects the remittitur, the Court will proceed to trial on the front pay issue only,

and, if an award is made following trial, shall enter an Amended Judgment at that

time.

DATED:  **December 22, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court